**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| BARBARA BARNES, as Independent | ) | |
| Administrator of the Estate of JOHN | ) | |
| BRADLEY BARNES, Deceased, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-cv-03257 |
| | ) | |
| GREENWOOD MOTOR LINES, Inc., | ) | |
| a Foreign Corporation d/b/a | ) | |
| R & L., CARRIERS, Inc. d/b/a R+L | ) | |
| CARRIERS, and MICHAEL | ) | |
| CHRISTOPHER HEGGER, | ) | |
| Defendants. | ) | |

## OPINION

**COLLEEN R. LAWLESS, United States District Judge:**

Before the Court are Defendants' Motions to Exclude the testimony of Plaintiff's expert witnesses, (Docs. 67, 69, 71, 81), and Plaintiff's Motions to Exclude the testimony of Defendants' expert witnesses. (Docs. 73, 75, 77, 79).

## I.    BACKGROUND

On November 4, 2020, around 5:20 A.M., John Barnes' box truck collided with the back of a trailer hauled by Defendant Michael Hegger, a driver for Defendant Greenwood Motor Lines, Inc. d/b/a R & L., Carriers, Inc. d/b/a R+L Carriers ("GML"). (Doc. 12 at ¶¶ 16–21). Barnes died in the collision. (*Id.* at ¶ 22). Plaintiff Barbara Barnes, John Barnes' wife, now sues Defendants for negligence and vicarious liability.

Plaintiff alleges Hegger's negligence caused the collision. Hegger had pulled over onto the shoulder of the interstate. From the shoulder, Plaintiff says Hegger negligently

reentered the lane right in front of Barnes, who then smashed into the trailer at a high speed. (*Id.* at ¶¶ 17–21). Plaintiff asserts Hegger violated his duty to operate, manage, maintain, and control his vehicle with ordinary and reasonable care—causing the collision and Barnes' death. (*Id.* at ¶ 23).

Defendants deny all liability and, in the alternative, contend Plaintiff's damages are the direct and proximate result of Barnes' own comparative negligence, comparative fault, contributory negligence, or contributory fault. (*See generally*, Docs. 18–19). Defendants allege Barnes was under the influence of tramadol when he died and he failed to properly operate and maintain his vehicle, reduce speed, yield the right-of-way, change lanes, and follow several traffic-safety regulations (Doc. 18 at 6–9; Doc. 19 at 4–7).

Each party retained, designated, disclosed, and deposed experts during discovery. As trial approaches, each party moves to exclude adverse expert testimony.

## II.     RULE 26 DISCLOSURE

The Court first evaluates arguments under Federal Rule of Civil Procedure 26(a). Under this Rule, Defendants seek to exclude the testimony of Dr. Sawyer and Plaintiff seeks to exclude the testimony of Sergeant Brachear.

### A. Legal Standard

Generally, a party "must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). If an expert "is one retained or specially employed to provide expert testimony in the case," the disclosure must contrain a written report prepared by the expert. Fed. R. Civ. P. 26(a)(2)(B). The report must contain, in pertinent part:

(i) a complete statement of all opinions the witness will express and the *basis and reasons* for them; (ii) the facts data or other information considered by the witness in forming them; [and] (iii) any exhibits that will be used to summarize or support them[.]

Fed. R. Civ. P. 26(a)(2)(B)(i–iii) (emphasis added).

"If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions." Fed. R. Civ. P. 37(a)(3)(A). Further, Rule 37 calls for the exclusion of an expert's testimony if the requisite disclosures have not been made "unless the failure was substantially justified or is harmless." *Gicla v. United States*, 572 F.3d 407, 410 (7th Cir. 2009) (*quoting* Fed. R. Civ. P. 37(c)(1)).

### B. Defendants' Rule 26 Challenge

Defendants seek to exclude Sawyer's testimony on the sequence of events of the accident under Rule 26(a)(2)(B). Sawyer testifies that the tramadol levels found in Barnes' blood after the collision ("looming") indicate Barnes was not impaired pre-impact and that Barnes' pre-impact response was appropriate ("reasonable response"). (Doc. 84 at 4). However, Sawyer's testimony on "looming" and "reasonable response" was not included in his disclosure. (*Id.*). As such, Defendants argue all Sawyer's testimony that informs his "sequence of the accident" testimony should be excluded. (Doc. 72 at 4). The Court finds exclusion is warranted, but only as to portions of the testimony.

Rule 26 allows Sawyer to give opinions from the disclosure. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)–(ii). In addition to the failure to disclose testimony on "looming" and "response time," the record reflects Sawyer did not have access to a factual foundation to make these opinions until the other expert reports were available to him. (Doc. 72, Ex. 2

at 110–111). Rule 37(c)(1) therefore demands the exclusion of these portions. "This sanction is automatic and mandatory unless the offending party" can show the violation "was either justified or harmless." *Ciomber v. Cooperative Plus, Inc.,* 527 F.3d 635, 641 (7th Cir. 2008) (citations omitted). Plaintiff does not argue this improper disclosure was justified or harmless, so the Court need not address these exceptions.

The remainder of Sawyer's testimony, however, was properly disclosed and remains admissible. Sawyer disclosed the factual bases of his opinion as to the sequence of the accident—outlining sources of information within the report to ground his testimony. (Doc. 72, Ex. 2 at 84–85, 89). Furthermore, Defendants do not explain what is meant by Sawyer's "sequence of the accident" testimony. (*Id.* at 4). As such, any categorical ban would be improper. For these reasons, Defendants' Motion to Exclude, (Doc. 71), is **GRANTED** as to portions of Sawyer's testimony related to "looming" and "reasonable response," but **DENIED** as to portions of testimony properly disclosed in the Rule 26(a)(2) report.

### C. Plaintiff's Rule 26 Challenge

Plaintiff seeks to exclude the testimony of non-retained expert witness Sergeant Brachear. Plaintiff claims Defendants have not disclosed "a summary of the facts and/or opinions they intend Sergeant Brachear to offer at trial" as required by Rule 26(a)(2)(C)(ii). (Doc. 75 at 1). The disclosed report, the Illinois Traffic Crash Reconstruction Report ("TCR Report"), incorporates by reference over 80 pages of appended materials ("TCR File") provided to all parties. (Doc. 76 at 2–3).

Plaintiff claims this disclosure "blanketly" references the TCR File and contains "many statements and some quasi-opinions" which have not placed her on adequate notice under Rule 26(a)(2)(C). (*Id.* at 3). But other than criticizing the length of the TCR File, Plaintiff does not explain how the disclosure was insufficient to place her on notice of the facts and opinions contained therein.

The legal authority Plaintiff cites provides little support for her position. She cites *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015), butthe witness disclosure in that case was provided *after* the expert disclosure deadline had expired—less than 90 days before trial—and was absent sufficient fact or opinion summary. Plaintiff also relies on *Musser v. Gentiva Health Services, Inc.*, 356 F.3d 751, 757 (7th Cir. 2004). The central issue in *Musser* was a party's conflation of Rule 26(a)(1)(A) with Rule 26(a)(2)(A)—after the party neglected to provide a distinct list of witnesses designated to provide expert testimony. *Id.* Further, the Rule 26(a)(2)(C) finding in *Musser* is not instructive as to the substantive contentions Plaintiff has with the TCR Report and the TCR File. *Musser* holds that "witnesses providing expert testimony because of their involvement in the facts of the case" is governed by Rule 26(a)(2)(C), but this is not at issue here. *Id.*

Here, the Court finds the TCR Report and its appended materials give adequate notice and go beyond what the Seventh Circuit considers a "bottom line" disclosure. *See Cripe v. Henkel Corp.*, 858 F.3d 1110, 1113 (7th Cir. 2017) (ruling noncompliance with Rule 26(a)(2)(C) where the non-retained expert provided no fact or opinion summary). In his report, Brachear accounts for his investigation of the accident, observations of both the vehicles involved in the collision, and his firsthand impressions from the accident scene.

He also reviewed additional materials in preparation for his testimony, including those disclosed to all parties and experts. (Doc. 88, Ex. 2 at 4–6). Brachear adequately grounds his determinations of fault by providing a descriptive sequence of the collision. These findings ground Brachear's conclusion that, before impact, Barnes failed to slow his vehicle or change traffic lanes, causing the collision. (*Id.* at 5). Further, other expert witnesses rely on the TCR Report and TCR File, indicating adequate notice has been given. (*See generally*, Doc. 88, Exs. 3–6). To require more would subvert the purpose of Rule 26(a)(2)(C) witnesses—requiring non-retained experts to provide the same level of detail as retained expert reports. The lower standard would be rendered meaningless.

Plaintiff has had over two years to depose Brachear to clarify his findings or resolve pending questions. *See Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) (finding parties must be given adequate notice and a reasonable time to prepare). She has had more than a "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses." *Walsh v. Chez*, 583 F.3d 990, 993 (7th Cir. 2009) (citations omitted). For these reasons, Plaintiff's Motion to Exclude, (Doc. 75), is **DENIED**.

## III.    RULE 702 ADMISSIBILITY

Turning to the primary inquiry, the Court limits its analysis to issues expressly disputed by the parties in the moving papers or incorporated by reference to the record

## A. Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony in federal court. *Artis v. Santos*, 95 F.4th 518, 525 (7th Cir. 2024) (*citing Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that *it is more likely than not* that:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert's opinion reflects *a reliable application of the principles and methods to the facts of the case.*

Fed. R. Evid. 702 (emphasis added).

Courts conduct a three-prong *Daubert* inquiry before admitting expert testimony—evaluating: (1) the expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017). At each prong, each corollary requirement of Rule 702 must be satisfied by a preponderance of the evidence. *Id.* at 782; *see also* Fed. R. Evid. 104(a). District courts have "substantial latitude in making the findings necessary to fulfill this gatekeeping role." *Artis*, 95 F.4th at 525 (*citing Von Duprin LLC v. Major Holdings, LLC*, 12 F.4th 751, 772 (7th Cir. 2021)).

The qualification prong tasks courts with evaluating the "knowledge, skill, experience, training, or education" of the expert. Fed. R. Evid. 702. "[A] court should consider a proposed expert's full range of practical experience as well as academic or

technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (internal quotation marks omitted).

Next, under the reliability prong, courts focus "on the expert's methodology, not his ultimate conclusions." *Kopplin v. Wisconsin Cent. Ltd.*, 914 F.3d 1099, 1104 (7th Cir. 2019). This prong demands courts ensure the sufficiency of the facts or data relied on and the expert's reliable application of the expert's methods and principles to those facts. Fed. R. Evid. 702(b)–(d). Courts are to primarily consider the "validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 806 (7th Cir. 2013).

Courts may consider several factors in assessing the reliability of an expert's methodology: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Baugh v. Cuprum S.A. de C.V.*, 845 F.3d 838, 844 (7th Cir. 2017) (*citing Smith*, 215 F.3d at 719). Another six factors set forth by reference under the 2000 Amendments to Rule 702 have since been endorsed by the Seventh Circuit:

> (5) whether 'maintenance standards and controls' exist; (6) whether the testimony relates to 'matters growing naturally and directly out of research they have conducted independent of the litigation,' or developed 'expressly for purposes of testifying'; (7) '[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion'; (8) '[w]hether the expert has adequately accounted for obvious alternative explanations'; (9) '[w]hether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting'; and (10) '[w]hether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.'

*Gopalratnam*, 877 F.3d at 779–80 (citations omitted); *see also C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827, 835 (7th Cir. 2015) (finding "this list is neither exhaustive nor mandatory").

An expert's opinion is not objectionable because it embraces an ultimate issue. *Anderson v. Raymond Corp.*, 61 F.4th 505, 510 (7th Cir. 2023). The "critical" point of the *Daubert* inquiry under the reliability prong "is whether there is a connection between the data employed and the opinion offered; it is the opinion connected to existing data 'only by the *ipse dixit* of the expert,' that is properly excluded under Rule 702." *Manpower*, 732 F.3d at 806 (*quoting General Elec. Co. v. Joiner,* 522 U.S. 136, 146 (1997)). Expert testimony cannot "be based on subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank,* 619 F.3d 748, 761 (7th Cir. 2010).

Finally, testimony meets Rule 702(a)'s relevance prong when it helps the factfinder "understand the evidence" or "determine a fact in issue." *Daubert*, 509 U.S. at 591. The proponent must demonstrate that the expert is "testify[ing] to something more than what is 'obvious to the layperson' in order to be of any particular assistance to the jury." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001) (*quoting Ancho v. Pentek* Corp.,

157 F.3d 512, 519 (7th Cir.1998)). Yet the expert need not have an opinion as to an ultimate issue to be sufficiently helpful to the jury. *Smith*, 215 F.3d at 718.

### B. Defendants' Rule 702 Challenges

Relying on Rule 702 and *Daubert*, Defendants seek exclusion of testimony offered by Plaintiff's experts: (1) Kevin Johnson; (2) Swaroop Dinakar; and (3) Adam Grill.

### 1. Kevin Johnson

Kevin Johnson is an accident reconstructionist. Plaintiff asked Johnson to investigate the circumstances of the collision to "determine the vehicle dynamics during the collision event and to analyze any available evidence and data relevant to the subject collision." (Doc. 85, Ex. 1 at 1). Johnson concluded Barnes likely performed a steering maneuver shortly before his box truck hit Hegger's trailer. (Doc. 85 at 3). In other words, Barnes may have swerved in a failed attempt to avoid the accident. Defendants seek to exclude this specific finding on reliability grounds. (Doc. 67 at 1).

Defendants argue Johnson's conclusions are unreliable as they are supported by nothing more than "bottom line" speculation as to the purported steering maneuver. (Doc. 68 at 6) (*citing Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010)). Defendants say Johnson did not adequately explain what methodology he used to reach his "offset crash" conclusion—contending the data reflect Barnes did *not* make a steering maneuver before hitting Hegger's trailer and Johnson is speculating. (*Id*. at 9). In response, Plaintiff claims Johnson applied well-accepted accident reconstruction principles and that Defendants conflate inference with speculation. Plaintiff contends Defendants' arguments go to the weight of the evidence, not its admissibility, and that "disagreements over an expert's

conclusions are issues for the jury, not grounds for exclusion." (Doc. 85 at 5) (*citing Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 765 (7th Cir. 2013)). On review of Johnson's report and testimony, the Court disagrees with Defendants that Johnson's testimony is grounded in the "*ipse dixit*" of the expert. *See Joiner*, 522 U.S. at 146.

Johnson's report is grounded in "the Laws of Physics, common practices used by those in the accident reconstruction industry, and review of scientific publications in the area of study." (Doc. 85, Ex. 1 at 17). With the assistance of peer-reviewed software, Johnson's report analyzes vehicle damage, collision dynamics, and data from the vehicle's Event Data Recorder. To assist in his collision analysis, Johnson relied on a scale diagram produced using aerial imagery from his site inspection; both photogrammetry and reverse projection were employed in Johnson's report to determine the location of the roadway evidence. Johnson ultimately observed the damage to Barnes' box truck was worse on its right side while damage to Hegger's trailer was worse on its left side. (*Id.* at 16). Johnson concluded this "offset crash" was consistent with Barnes engaging a steering maneuver prior to impact. (Doc. 85, Ex. 2 at 31–32).

Johnson testified, "[w]e know it's an offset crash" between Mr. Barnes' box truck and Mr. Hegger's trailer, based on the known location of the tractor, gouge marks on the roadway associated with the impact, damage to the trailer, damage to the Chevrolet box truck, and the area where impact occurred." (*Id.* at 32). In support of this conclusion, Johnson also notes that "based upon how people travel down the lanes of travel, we typically don't see people just driving down the roadway at night with their left tire on the center line." (*Id.* at 38). Although Johnson admits Barnes may not have

attempted to maneuver before the collision, he believes it is more likely the maneuver was attempted. (*Id.* at 32–33).

Despite Defendants' arguments, Johnson's inferences are distinguishable from laymen speculation. The former has the benefit of expertise, observation, and close understanding of the facts available, or what the Seventh Circuit has described as "soundness and care" in the formulation and application of methodology. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013). Johnson first describes what an offset collision is—a misalignment in vehicle impact centers—and how damage patterns and vehicle alignment can reveal vehicle's pre-impact behavior. Next, he identifies plausible scenarios leading to an offset collision, including steering maneuvers or lane positioning, and narrows the possibilities based on the evidence. Finally, Johnson determines that, of the plausible scenarios, the steering maneuver by Barnes is the most likely explanation.

Therefore, Johnson's testimony satisfies Rule 702. Defendants' critiques go to the weight of Johnson's testimony, not its admissibility. *See Metavante Corp.*, 619 F.3d at 762. Defendants may employ "the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof'" at trial. *Artis*, 95 F.4th at 527 (*quoting Daubert*, 509 U.S. at 596). Accordingly, Defendants' Motion to Exclude, (Doc. 67), is **DENIED**.

### 2. Swaroop Dinakar

Defendants next seek to exclude Swaroop Dinakar's testimony on Barnes' "response as compared to a typical motorist" as it is impermissibly premised on Johnson's analysis. (Doc. 69 at 1–2). Dinakar is a human factors expert who evaluated the

driving performance of Barnes and Hegger before the collision. Dinakar found Barnes' response to Hegger entering the lane in front of Barnes was "within the range of typical responses of attentive drivers." (Doc. 87, Ex. 2 at 25). Defendants challenge the relevance and reliability of his opinions.

Defendants construe Dinakar's testimony as impermissibly dependent on Johnson's accident reconstruction findings. (Doc. 70 at 6–7). In response, Plaintiff claims Defendants fundamentally misrepresent Dinakar's methodology and the purpose of his testimony, submitting his conclusions are "rooted in established research, independent evaluation of driver behavior and the universally agreed-upon fact of the collision's off-set nature." (Doc. 87 at 3). The Court agrees with Plaintiff.

Defendants claim Dinakar's opinions improperly rely on Johnson's inadmissible speculative findings.First, the Court has already determined Johnson's testimony is admissible under Rule 702. Second, and more importantly, Dinakar's testimony is not *independently* reliant upon Johnson's findings to make his human factors conclusions. Under his "classical, scientific methodology," Dinakar's report includes an analysis predicting Barnes' brake response time pre-impact. (*Id.*, Ex. 1 at 5). Dinakar suggests drivers commonly make steering maneuvers without braking before collisions. (*Id.*, Ex. 2 at 17–19). Dinakar also compared the sample driver response to the responses of Barnes and Hegger, finding Barnes' responsive maneuver was within the range of typical responses of attentive drivers. (*Id.*, Ex. 1 at 5). Alongside behavioral research, Dinakar explained the existence of the offset collision indicates Barnes likely made a pre-impact steering maneuver. (*Id.*, Ex. 1 at 35; Ex. 2 at 12–18).

"It is enough if the expert makes clear what his opinion is, based on the different possible factual scenarios that might have taken place." *United States v. Hall*, 93 F.3d 1337, 1346–47 (7th Cir. 1996). "[I]t is common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). Here, Dinakar may defer to Johnson's conclusions to inform and supplement his own testimony as a human factors expert—resulting in expert findings that have been crafted with "soundness and care." *Schultz*, 721 F.3d at 431. Thus, Dinakar's testimony satisfies Rule 702(b), (c), and (d).

Finally, Dinakar's testimony meets the relevance prong. To resolve the ultimate issue, the jury will be asked to evaluate the proximate causation of the collision. Dinakar's testimony aids the jury in understanding what constitutes reasonable driving behavior in consideration of perceptual and behavioral human factors at play before the collision. Dinakar's testimony assists the trier with its task on an issue not obvious to the layman observer, bridging the gap between accident reconstruction concepts and behavioral research trends. *Daubert*, 509 U.S. at 591. Continued debate over the credibility of Dinakar's conclusions is better engaged by the ordinary tools of litigation—not exclusion. *Artis*, 95 F.4th at 527 (*quoting Daubert*, 509 U.S. at 596). As such, Defendants' Motion to Exclude, (Doc. 69), is **DENIED**.

### 3. Adam Grill

Defendants next seek to exclude Adam Grill's testimony, arguing it fails all three Rule 702 prongs. Plaintiff proffers Grill as an expert in professional trucking—including

concepts in commercial motor vehicle ("CMV") safety, operation, and motor carrier management. Grill's report includes the following findings:

1. Defendant Hegger was required to have the necessary knowledge, skills, and safe driving attitude to prevent crashing into others or have others crash into him, but failed to apply such knowledge, skill, and attitude as indicated in this report.

2. Defendant Hegger had a responsibility to adhere to industry regulations and standards in at least the following ways but failed to meet these standards as indicated in this report:
   a. Responsibility to follow industry standards, customs, and practices regarding not parking on the shoulder of a highway;
   b. Responsibility to safely manage space between his vehicle and other roadway users;
   c. Responsibility to operate with due caution as it relates to accident avoidance.

3. Defendant Hegger's action of parking on the shoulder of an Interstate Highway was grossly negligent and reckless.

4. [GML] is responsible for the actions of Defendant Hegger as it relates to the safe operation of a CMV.

5. [GML] is responsible to train and supervise their professional drivers; namely Defendant Hegger.

6. According to industry standards, this collision was preventable on the part of [GML] and their driver, Defendant Hegger.

(Doc. 82, Ex. 2 at 28) (Conclusions 1–6, respectively).

Conclusions 1, 2, and 3 relate to Hegger's "operator performance" while driving his CMV tractor-trailer. Conclusion 4 and 5 focus on the purported "motor carrier management" responsibilities of GML, Hegger's employer. Only the preventability determination, Conclusion 6, implicates both Hegger and GML. (*Id., citing* Conclusion 6). Yet even this finding is grounded in alternative standards of care: *CMV operator* versus

*motor carrier*. Accordingly, the Court bifurcates its analysis—separating its assessment of Grill's findings as they independently pertain to Hegger and GML.

### a. CMV Operator Performance

Under the qualification prong, Defendants argue Grill does not possess the requisite knowledge, skills, experience, training, or education to provide opinions or testimony regarding the cause of the subject accident because he is not an accident reconstructionist and did not investigate the cause of the subject accident. (Doc. 82 at 12–13). Yet, Grill is proffered as an expert to provide a determination of Hegger's adherence to standard industry practices from a commercial trucking standpoint. He is not provided to reconstruct the accident or provide human factors analysis related to the collision.

Grill is, however, well suited to provide expert testimony on commercial trucking and adherence of CMV operators to industry standards.[1] The Court's assessment of his testimony is like that of the district court in one of several cases[2] Defendants offer in support of Grill's exclusion. *See Failla v. George's Foods, LLC,* No. 220CV07109BRMJSA, 2023 WL 7298473 *at 8–9 (D.N.J. Nov. 6, 2023). In *Failla,* Grill was proffered, as he is here, to provide testimony as to a CMV operator's adherence to various industry guidelines

---

[1] Grill has over 15 years of experience as a commercial truck driver, safety director, and motor carrier consultant. He trains fleet safety management and regulatory compliance. Grill is a certified CMV operator with endorsements for hazardous materials, tankers, double trailers, triple trailers, passenger buses, and school buses. He has assisted in over a dozen special studies and trucking projects covering safety procedures as well as time and motion studies including visibility, starting, stopping, and turning.

[2] *See Butler v. Adorno,* No. 5:21-CV-182, 2024 WL 1314810, at *6 (M.D. Ga. Mar. 27, 2024 (excluding Grill's testimony under each prong of the *Daubert* inquiry); *Perez v. K&B Transportation, Inc.,* No. 17 CV 2610, 2019 WL 4749989 (N.D. Ill. Sept. 30, 2019), *rev'd and remanded sub nom. Perez v. K&B Transportation, Inc.,* 967 F.3d 651 (7th Cir. 2020) (excluding Grill's testimony under the reliability prong; Seventh Circuit affirming exclusion); *Regan v. Mt. States Water Serv., Inc.,* No. 21-CV-44-J, 2022 WL 17403510, at *4–5 (D. Wyo. Nov. 30, 2022) (excluding Grill's testimony both for lacking a factual basis under the reliability prong and for lacking helpfulness to the trier under the relevance prong).

that inform the professional standard of care in commercial trucking. In *Failla*, Grill concluded the CMV operator did not drive "defensively" in accordance with those professional standards. The *Failla* Court took no issue with his assessment of the CMV operator, finding Grill applied relevant industry standards and regulations then properly linked the facts to his conclusion. *Id.*

Grill's report as to Hegger is similar to his evaluation of the CMV operator in *Failla*. He identified the requisite standards and guidelines then applied them to Hegger's actions and omissions before the fatal collision. Grill ultimately found Hegger failed to adhere to the purported standard of care. Like the holding in *Failla,* this Court finds the testimony on Hegger's acts and omissions is well-informed by "Grill's technical knowledge as well as his professional and personal experience." *Id.* (*citing Kumho,* 526 U.S. at 152). Although proffered by Defendants to attack the reliability of Grill's findings, the case does more to support admission of Grill's testimony for its specific purpose.

That said, Defendants' arguments as to Grill's improper legal conclusions are well-taken. While "legal" testimony is permissible in some circumstances, it may not inform the law that governs the case. To allow otherwise would improperly usurp this Court's role as the trier of law. *United States v. Sinclair,* 74 F.3d 753, 757 n.1 (7th Cir. 1996) (emphasizing that a witness "cannot testify about legal issues on which the judge will instruct the jury"). Under Seventh Circuit precedent, "expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible." *Good Shepherd Manor Found. v. City of Momence,* 323 F.3d 557, 564 (7th Cir. 2003). "There is a difference

between stating a legal conclusion and providing concrete information against which to measure abstract legal concepts." *United States v. Blount,* 502 F.3d 674, 680 (7th Cir. 2007).

Although Grill is qualified to opine on Hegger's purported adherence to requisite standards of commercial trucking, he may not make legal findings—such Conclusion 3's finding that Hegger was "grossly negligent and reckless" for parking on the side of the interstate. (Doc. 82, Ex. 2 at 28). In making this finding, Grill improperly conflates his determination of noncompliance with industry standards of commercial trucking with a legal finding of negligence. He may not shoehorn definite legal determinations of liability into his testimony. Moreover, admission of Conclusion 3 risks substantial danger of prejudicing the jury or, at the very least, confusing them. These risks far outweigh any probative benefit resulting from admission. *See* Fed. R. Evid. 403. For these reasons, Conclusions 1, 2, and 6 (as to Hegger) satisfy the qualification requirement of Rule 702. However, Conclusion 3 shall be excluded under Rule 702 and Rule 403 as Grill is non qualified to provide such testimony andits admission risks undue prejudice and confusion of the ultimate issues.

The Court next approaches the reliability prong. Grill has researched and compiled the applicable industry standards and regulations for commercial truck drivers, which Hegger is purportedly subject to. (Doc. 82, Ex. 2 at 21–27). In application of these standards, Grill says human factors expertise relevant to accident reconstruction is unnecessary for his testimony and that the standards apply regardless of a driver's perception and reaction time is. (Doc. 82, Ex. 3 at 141).

Grill applied his expert methodology by analyzing the video footage, police crash reports, and Hegger's deposition testimony. In assessing this information, Grill determined Hegger's failure to comply with industry standards such that the accident was preventable due to his acts and omissions that day. Although unclear in the report, he maintains the testimony aims to separate the "preventability determination" with assertions of fault or negligence—making "no representation that my preventability determination has anything to do with the fault or a negligent standard. I think they are completely separate. So, I'm not trying to say this means they are at fault or someone is negligent." (*Id.* at 127). In emphasizing this separation in his findings, he makes no conclusions as to whether Barnes could have prevented the accident. (*Id.*)

To the extent his methodology informs the preventability determination as to Hegger, Grill suggests it is "part of the normal analysis and process for a certified director of safety like myself. It's an integral part of determining whether or not there are reasonable actions by the driver of the motor carrier." (Doc. 82, Ex. 3 at 126–127). Grill describes Conclusion 6 as one that shows Greenwood and Hegger could have prevented the collision. (*Id.* at 127). In the application of this methodology to the facts, video, testimony, and reports available to Grill, he further says Hegger failed to prevent the collision by prior engagement in the successful safety management systems he outlines at length in his own expert report. (*Id.* at 98). Grill submits that his methodology informed by these "trip management concepts" render Hegger's decision to park on the road shoulder inconsistent with industry standards. (*Id.* at 103, 108). Grill also contends that Hegger's method and procedure for re-entering the roadway was dangerous and

unreasonable. (*Id.* at 108). This testimony is consistent with Grill's findings outlined in his report, suggesting several alternatives were available to Hegger rather than pulling off onto the shoulder of the Interstate. Although the expert report may not be the most well-structured or succinct, it is evident Grill's findings are grounded in the industry standards guiding CMV operation. In applying those standards, his analysis is further informed by technical knowledge and experience in professional trucking.

Defendants allege Grill did not conduct "a sufficient investigation to support any conclusions with regard to any alleged negligence by" Barnes. (Doc. 82 at 10) (*citing Barrett v. Rhodia, Inc.*, 606 F.3d 975, 980 (8th Cir. 2010)). In *Barrett*, the Eighth Circuit affirmed the district court's exclusion of a board-certified allergist who testified to Barrett's exposure to hydrogen sulfide gas—finding reliance on a medical textbook was insufficient as a methodological foundation to provide expert testimony on the causation of brain injury. *Id.* at 981. "Her opinion concerning the concentration of Barrett's toxic exposure was admittedly based on assumption, without any scientific testing or exposure analysis." *Id.* Although lacking connective analysis between the facts of *Barrett* and the case here, Defendants appear to say Grill's testimony is underdeveloped and unreliable because he failed to address any alleged deviation by Barnes from the Federal Motor Carrier Safety Administration ("FMCSA") regulations that may have led to the collision. Defendants discuss this theme more concretely in its reply; emphasizing another case involving Grill, *Butler v. Adorno*, No. 5:21-CV-182, 2024 WL 1314810, at *5–8 (M.D. Ga. Mar. 27, 2024). Defendants suggest district courts of the past are highly skeptical of Grill under all three prongs of the *Daubert* inquiry. Yet upon closer inspection of *Barrett* and

*Butler*, the Court finds these cases distiguishable from the instant facts and Grill's testimony as to Conclusions 1, 2, and 6 (as to Hegger).

The parties all agree Grill lacks the requisite knowledge, skill, or expertise to testify about subjects such as human factors, accident reconstruction, medical assessments, or toxicology. (Doc. 82, Ex. 3 at 93–95, 100, 128). This is unlike the facts of *Barrett*, where the medical expert opined upon the cause of the plaintiff's brain damage and then conceded that such findings fell outside the scope of her expertise.

Defendants' use of *Butler* to contest reliability is equally unpersuasive. For example, one point of controversy in *Butler* was Grill's finding that the "driver did something intentionally, or he had inadequate training that would prepare him for operating adverse to those issues." *Butler*, 2024 WL 1314810, at *6–7. The *Butler* court found this testimony did not sufficiently account "for obvious alternative explanations" for the accident: (1) the driver's motor carrier adequately trained him, the driver was nonetheless negligent; (2) plaintiff was negligent; or (3) neither party was negligent because the accident was unavoidable. *Id*. at 6. The *Butler* court found Grill did "little to rule out" these possibilities and took issue with his selective approach to the analysis. *Id*.

The Court finds the facts of *Butler* are distinguishable from this case such that Grill's omission of analysis as to Barnes is of limited consequence to the admission. In *Butler*, the drivers implicated in the crash were both operating tractor-trailers. Here, although both drivers operated CMVs purported to be regulated under the same industry standards, only one drove a tractor-trailer (Hegger), a vehicle of which Grill's expertise is grounded. Nor is there any indication that the drivers in *Butler* were under the

influence of tramadol. Whereas, here, Barnes was purportedly under the influence of tramadol and subject to several perceptual, medical, and attentiveness deficits—implicating areas of expertise on which Grill is not qualified to give his opinion.

Nor have Defendants provided authority indicating an expert in professional trucking must opine upon the compliance of *each* driver involved in a collision under applicable industry standards to satisfy the reliability prong. This may be the case with respect to more refined purposes—such as accident reconstruction—but that does not bind Grill to producing alternative causation or preventability analyses under his limited purpose. *See Wendler & Ezra, P.C. v. Am. Int'l Group, Inc.*, 521 F.3d 790, 791 (7th Cir. 2008) (finding testimony on what IP address a post originated from inadmissible where expert report failed to say what software was used, what data was entered, what results were produced, and how alternative explanations were ruled out). If Grill applied the same methodology and standard of care analysis to Barnes as he did Hegger, the methodology would be inherently unreliable and would violate basic principles set forth in *Daubert* and its progeny. One of the core "purpose[s] of the *Daubert* standard is to ensure that any admitted scientific evidence is reliable; that is, well-grounded in methods and procedures of science. The focus of the district court's *Daubert* inquiry must be solely on principles and methodology, not on the conclusions they generate." *Chapman v. Maytag Corp.*, 297 F.3d 682, 687 (7th Cir. 2002) (citations omitted).

On the other hand, to evaluate Hegger's acts and omissions, he need only refer to FMCSA regulations, industry standards, as well as reflections from his personal observations from over fifteen years of experience operating tractor-trailers. To that end,

he concludes narrowly as to Hegger's conformity to purported standards of care in the trucking industry as well as the preventability of the collision on his account—providing alternatives that could have been taken as an operator of a tractor-trailer to avoid the circumstances that led to the accident. To the extent his findings as to Hegger's acts and omissions are deficient as to telling the narrative of the accident and proximate causation, disagreement with factual underpinnings do not warrant exclusion. *Walker v. Soo Line R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000) (finding the district court should not dwell on the "factual underpinnings" of the testimony but should determine whether "[i]t was appropriate for [the expert] to rely on the test that he administered and upon the sources of information which he employed"). For these reasons, the Court finds Conclusion 1, 2, and 6 are reliable under Rule 702.

Finally, under the relevance prong, the Court also finds Grill's Conclusions 1, 2, and 6 (as to Hegger) are sufficiently helpful to the jury in its determination of the ultimate issue. *See* Fed. R. Evid. 702(a). Grill's testimony aids the jury in determining whether Hegger's actions and decisions complied with certain industry-wide standards which, Grill contends, compel CMV operators to exercise reasonable caution and avoid actions that disrupt the flow of traffic. Grill's finding that Hegger held responsibilities under these several standards as a CMV operator is relevant and helps the trier of fact determine whether the purported acts or omissions of the drivers proximately caused Barnes' injuries.

Grill's finding that Hegger could have prevented the accident is equally relevant to this end. Grills' preventability determination concerning Hegger is far more probative

of ultimate resolution than its risk of undue prejudice or confusion of the jury. *See* Fed. R. Evid. 403; *see also Stollings*, 725 F.3d at 768 ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."). Grill's testimony as to several reasonable alternatives Hegger could have taken rather than parking on the shoulder of the interstate is, for example, substantially probative of Hegger's acts or omissions that may have prevented the collision.

Any remaining disagreement over Grill's testimony is better resolved at trial by the ordinary tools of litigation. *Artis*, 95 F.4th at 527 (*quoting Daubert*, 509 U.S. at 596). Therefore, Conclusions 1, 2, and 6 (as to Hegger) satisfy Rule 702.

**b. Motor Carrier Management**

Next, with respect to Conclusions 4, 5, and 6 (as to GML), Grill contends GML had to ensure its drivers followed applicable federal regulations. (Doc. 82, Ex. 2 at 13). He also says GML had a responsibility to deploy successful safety management systems, like a training program, that would effectively prevent such a collision from occurring. (*Id.* at 14). Grill concludes it is "obvious" Hegger was "not properly trained" by GML, or if he was, this training was not sufficiently "reenforced" by GML. (*Id.* at 20). Grill concludes, is that it was "negligent" of GML "to not train their drivers that parking on the shoulder of a highway is dangerous and a hazard." (*Id.*).

Consistent with its analysis of Conclusion 3, the Court also finds Grill is unqualified to make the legal pronouncements of GML's "negligence" proffered in Conclusion 4 and 5. *See City of Momence*, 323 F.3d at 564. Not only do these legal pronouncements speak to the ultimate issue of the case, but there is also high likelihood

it will unduly confuse and prejudice the jury in its judgment of Hegger's liability. *See* Fed. R. Evid. 403. Yet even if the qualification prong was met absent such criticism, Plaintiff fails to show how these findings meet Rule 702(b)–(d).

Unlike his analysis of Hegger's responsibilities and related preventability determination, Grill's assertions as to GML under Conclusions 4, 5, and 6 are rittled with improper speculation. Grill suggests GML caused the accident through its neglience in providing inadequate training infrastructure for Hegger—finding this connection "obvious" without connecting the regulations and industry practice making up his methodology with relevant facts and data. (Doc. 82, Ex. 2 at 13–20).

Further, although *Failla* supports admission of Grill's testimony as to Hegger's responsibilities as a CMV operator, it stands equally for the proposition that Grill's testimony as to GML's responsibilities as a motor carrier must be excluded. *See Failla*, 2023 WL 7298473 *at 8–9. Specifically, the court in *Failla* found "Grill fails to provide any grounds or methodologies by which he came to the conclusion that the [motor carrier] breached [its] duty to supervise" the CMV operator. *Id*. The district court also found "Grill provides industry standards and regulations then concludes [the employer was] negligent and violated these regulations because of the mere fact that an accident occurred." *Id*. This is analogous to Grill's finding of GML's neglect in the training and supervision of Hegger. The Court finds Grill's analysis to be superficial and grounded in a deficient set of facts. As such, Grill's testimony as to GML's role in this case is the prohibited "*ipse dixit*" of an expert. *Manpower*, 732 F.3d at 806 (*citing Joiner*, 522 U.S. at 146); *Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1339 (7th Cir. 1989) ("An

expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."). Grill's analysis as to Conclusion 4, 5, and 6 violates Rule 702(b) and (d) by failing to demonstrate reliable application of methodology to a sufficient set of facts and data.

The purported omissions of GML as to training and supervision of Hegger also fail to meet the relevance prong under Rule 702(a), as Plaintiff does not bring any actions grounded in negligent training or supervision, and Grill's conclusions as they relate to GML are simply too far attenuated from the negligence claims against Hegger as a CMV operator. The testimony is largely unhelpful to the trier of fact in resolution of the ultimate issue—whether the purported acts or omissions of the drivers proximately caused Barnes' injuries. *See* Fed. R. Evid. 702(a).

Even if Rule 702 was met, the Court sees no path to admission of this testimony under Rule 403. Burdening the jury with the attenuated duties and speculative breach by GML risks substantial danger of unfair prejudice and confusion of the issues by the jury. For these reasons, Conclusion 4, 5, and 6, are excluded. Defendants' Motion to Exclude, (Doc. 81), is **GRANTED IN PART** and **DENIED IN PART**.

### B. Plaintiff's Rule 702 Challenges

Plaintiff seeks to exclude testimony from David Griffin, Sergeant Brachear, Nathan Lombardo, and Dr. Christopher Spaeth.

### 1. David Griffin

Plaintiff seeks to exclude specific portions of testimony of Griffin, a proffered expert in federal motor carrier safety and accident preventability. Plaintiff objects to

Griffin's following opinions: GML "has demonstrated safety management controls that meet the prescribed FMCSA Safety Fitness Standards outlined in 49 CFR Part 385" (Opinion 2); "FMCSA safety statistics published on their public websites indicate" GML has historically operated "in an extremely safe and compliant manner"(Opinion 3); and "the accident was preventable" by Barnes. (Opinion 6). (Doc. 74, Ex. 2 at 2–5).

### a.  Motor Carrier Management

As to Opinions 2 and 3, Plaintiff argues Griffin impermissibly equates general compliance data and safety ratings with real-time safety. Defendants respond that Griffin's Opinions 2 and 3 satisfy the requirements of Rule 702 and rebut the testimony of Grill. Even so, the Court has excluded Grill's findings that would warrant admission of Griffin's Opinions 2 and 3 for purposes of rebuttal or clarification. As the purpose to proffer such opinions is now moot, they shall be excluded.

### b.  Preventability Determination

Griffin's preventability determination, however, is admissible. Griffin states Barnes could have prevented the accident according to the FMCSA Preventability Guide. (Doc. 74, Ex. 2 at 5). As he testified, Griffin's role as an expert was to establish whether Barnes' operation of his vehicle fell under the FMCSA standards and, if so, whether the subject accident was preventable by either driver. (Doc. 91, Ex. 2 at 42–43).

As to the qualification prong, Plaintiff argues Griffin lacks specialized knowledge to determine whether Barnes could have prevented the collision or that his career and expertise involves macro-level evaluation of motor carrier safety compliance and the issuance of safety ratings. This is, Plaintiff suggests, unique to the assessment of a CMV

operator such as Barnes. Indeed, much of Griffin's career as an FMCSA special agent has been related to the issuance of safety ratings for transportation companies and motor carriers—issues attenuated to the proximate cause of the collision. But unlike ordinary witnesses, an expert is permitted substantial latitude to offer opinions, including those that are not based on firsthand knowledge or observation. *See Daubert*, 509 U.S. at 592 ("Presumably, this relaxation of the usual requirement of firsthand knowledge [ ] is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.").

Consistent with this flexibility set forth in *Daubert* and its progeny, Griffin is well-positioned to testify about whether the collision was preventable by Barnes or Hegger. Consistent with his 22 years of training and experience as a safety specialist and compliance investigator for FMCSA, Griffin has significant experience in both application and training of CMV operators and motor carriers. (Doc. 91, Ex. 1 at 14). As an investigator, Griffin performed audits to ensure motor carriers and the CMV operators they employ comply with federal guidance. (*Id.*, Ex. 2 at 12–13). Further, as Barnes was driving a box truck subject to CMV operation regulation, Griffin may employ his knowledge of applicable industry regulations to the facts of the case and make an informed preventability determination as to Barnes.

Next, Griffin's preventability determination holds ground under the reliability prong. Griffin provides the text of FMCSA's Preventability Guide on "Accident Countermeasures" in support of his methodology. (*Id.*, Ex. 3 at 3–4). This guidance says a rear collision is preventable if the driver: (1) failed to keep track of traffic conditions and

did not slow down; (2) failed to maintain safe following distance and have his/her vehicle under control; (3) failed to ascertain whether vehicle ahead was moving slowly, stopped, or slowing down for any reason; and (4) misjudged the rate of overtaking. (*Id.*). Griffin testies these four points apply here because Barnes' allegedly failed to apply his brakes, take evasive action, or disengage his cruise control. (Doc. 91, Ex. 2 at 50, 52). Griffin admits his preventability determination was made without a human factor analysis or accident reconstruction, instead relying on general FMCSA guidelines and his personal experience. (Doc. 74, Ex. 1 at 53–54). Griffin also admits he could "probably not" affirmatively say whether Barnes could have "appreciated and responded in a timely manner" to avoid the collision. (*Id.*). He said he would defer to the other disclosed experts on the issues of reconstruction and perception reaction time as it relates Barnes' ability to avoid the collision. (*Id.*). Despite Defendants' suggestion, these admissions by Griffin are not fatal to the reliability of his testimony under Rule 702.

Like the methodology Grill used in his preventability analysis of Hegger, Griffin grounds his methodology by determining whether Barnes was subject to and in compliance with applicable FMCSA standards of CMV operator. Unlike Griffin, Grill was uncomfortable in extending his analysis in this way, saying perception/reaction calculations and medical concerns were outside his area of expertise. (Doc. 82, Ex. 3 at 128). On the other hand, Griffin had information he believed fell within his expertise to properly evaluate Barnes in this manner, including the TCR Report, opinions of Dinakar and Johnson, and Hegger's testimony. (Doc. 91, Ex. 2 at 60–62).

This information further informed Griffin's preventability determination—such as the assessment of distance between vehicles and the suggestion Barnes never braked or made any evasive action. (*Id.* at 68). The Court finds none of Griffin's reliance to be unduly speculative given the scope of his expertise and reliable application of his methodology to the facts and data available. As a general matter, there is nothing objectionable about an expert relying on the work of another expert. *See Gopalratnam*, 877 F.3d at 789 (citations omitted). Such a scenario is explicitly contemplated under the rules of evidence. *See* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."). Yet the facts or data relied upon must themselves be the kind that "experts in the particular field would reasonably rely on . . . in forming an opinion on the subject." *Id.*

Griffin also says his analysis is identical to that he used for years as an FMCSA agent. (Doc. 91, Ex. 2 at 68–69). In that role, he developed an understanding of the facts of a case, analyzed the acts or omissions of the subject CMV operators and motor carriers, compared the standard practices and training of CMV operators with those subject drivers or motor carriers, and explained consistencies (or inconsistencies) between what the subject CMV operators or motor carriers did and what applicable practices required or recommended under the circumstances. (*Id.* at 64); *See Metavante*, 619 F.3d at 761 ("An expert's testimony is not unreliable simply because it is founded on his experience rather than on data."). For areas outside the expertise of an expert witness, such as Griffin's lack of knowledge in the area of accident reconstruction and human factors, he may and "indeed must, rely upon . . . other experts having such industry-specific experience." *See*

*Gopalratnam*, 877 F.3d at 789 (*quoting Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.,* 807 F.3d 1283, 1303 (Fed. Cir. 2015)). Deferring to expert opinions on matters outside his expertise, such as Johnson and Dinakar, Griffin informs his own approach and conclusions. This deference does not undermine the reliability of his methodology. For these reasons, Defendants have satisfied the reliability requirements of Rule 702.

Finally, Griffin's testimony meets the relevance prong. Plaintiff challenges Griffin's Opinion 6, arguing that a FMCSA preventability determination is not relevant. But it appears Plaintiff conflates jury instructions on the applicable legal standard with expert opinion testimony on whether Barnes complied with industry standards. Unlike Grill's Conclusion 3, Griffin's preventability finding does not opine on whether Barnes' acted negligently. FMCSA preventability determinations merely set forth a standard to which Griffin argues Barnes was subject. Griffin's conclusion that Barnes' deviation from these standards led to a preventable accident is not a conclusion of legal liability or negligence. Moreover, Griffin's expert opinion testimony under Opinion 6 is both highly probative in rebuttal to Grill's Conclusion 6. Given Grill's choice not to assess preventability of the accident on the part of Barnes, Griffin's testimony is helpful to provide the jury with rebuttal testimony sought to clarify outstanding issues.

As Defendants have satisfied the requirements of Rule 702, select admission of Griffin's testimony is warranted. Continued debate over the credibility of Griffin's conclusions is better engaged by the ordinary tools of litigation. *Artis*, 95 F.4th at 527 (*quoting Daubert*, 509 U.S. at 596). For these reasons, Plaintiff's Motion to Exclude, (Doc. 73), is **GRANTED IN PART** and **DENIED IN PART**.

### 2.  Sergeant Bradley T. Brachear

Plaintiff next seeks to exclude the testimony of Defendants' nonretained expert Sergeant Brachear on reliability grounds. Defendants offer his testimony as to his involvement in the TCR Report and TCR File. (Doc. 88, Ex. 1 at 3). Plaintiff specifically seeks exclusion of "opinions from Sergeant Brachear about the cause of the accident or relative fault of the accident." (Doc. 75 at 2). Plaintiff submits that Brachear's testimony is inherently unreliable because his findings are undercut by the technical language in the TCR Report—citing to the "Reconstruction Disclaimer" in relevant part:

> **An in-depth causation analysis of this crash was not presented in this report.  The purpose of this response report is to document the Traffic Crash Reconstruction Unit's involvement with this crash.**  The information and interpretation included in this report do **not** stand alone as a reconstruction.

(Doc. 76, Ex. 1 at 6) (original emphasis). The TCR Report goes on to offer Brachear's determination of fault, that "Barnes failed to slow the Chevrolet or move to the left lane, causing the front-end passenger side to strike the rear driver-side of the second Great Dane being pulled by Mr. Hegger." (Doc. 76, Ex. 1 at 5).

Plaintiff challenges the admissibility of these findings by reference to the purpose for which the TCR Report was prepared by the Illinois State Police—contending "[a]ny testimony from Sergeant Brachear beyond the fact that the two vehicles made contact with one another would require the court to permit his unsupported speculation or his subjective belief about what happened in this accident." (Doc. 76 at 7). To this end, Plaintiff appears to discuss issues of qualification and relevance in her reliability analysis—questioning Sergeant Brachear's ability to engage with sufficient sets of facts

or employ any reliable methodology *because* the narrow purpose or scope of his testimony is limited under the TCR Report's disclaimer.

Despite this disclaimer, Brachear can still give his firsthand observations as to fault or causation. The Seventh Circuit has found that officers may testify to their observations of an accident site, including opinions of fault and causation, if sufficiently grounded in physical evidence. *See Kelsay v. Consolidated Rail Corp.*, 749 F.2d 437, 449 (7th Cir. 1984). An expert may base their opinions on experience. *See Kumho Tire Co.*, 526 U.S. at 148–149; *see also Smith*, 215 F.3d at 718 ("While extensive academic and practical expertise in an area is certainly sufficient to qualify a potential witness as an expert, Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience.").

Brachear's testimony provides firsthand observations and conclusions drawn from them while serving as an officer on-scene. In the development of the TCR Report, Sergeant Brachear stated and made reference to his discussion with other officers who also responded to assist with the investigation of the collision. (Doc. 88, Ex. 2 at 4–5). The report outlines his observations of physical evidence at the scene—including each vehicle's orientation on the road and directional notations, areas of contact damage between the vehicles, significance of front-end damage of Barnes' vehicle, area of impact indicated by gouging and scraping of the pavement, and fluid on the pavement. (*Id.*). Brachear also considered aerial images of the scene, read another officer's report, viewed the video recording of the accident from Hegger's truck, and reviewed photographs of

the scene. (*Id*.). In full assessment of his report and findings, it is evident Brachear's testimony on fault and causation satisfies reliability requirements under Rule 702.

Although Plaintiff questions the facts and data relied on by Sergeant Brachear in the development of the TCR Report, he may rely on disputed facts to reach his opinions as long as there is evidence to support such facts. "The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible." *Stollings*, 725 F.3d at 768. Experts can base their opinions on disputed facts because the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Kawasaki Kisen Kaisha, Ltd. v. Plano Molding Co.*, 782 F.3d 353, 360 (7th Cir. 2015) (internal quotation marks omitted). Plaintiff may then challenge Brachear's first-hand observations and conclusions drawn from them at trial. *Artis*, 95 F.4th at 527 (*quoting Daubert*, 509 U.S. at 596).

Therefore, in addition to the Rule 26 ground, Brachear's testimony is admissible for its proper purpose under Rule 702. Plaintiff's Motion to Exclude Testimony, (Doc. 75), is **DENIED**.

### 3.  Nathan Lombardo

Plaintiff next seeks to exclude the testimony of Nathan Lombardo. Lombardo is a purported accident reconstructionist, yet Plaintiff contends he improperly opines on driver attentiveness, perception response times, and crash avoidance as to Barnes. (Doc. 77 at 1). That said, in her briefing, Plaintiff appears to narrow the scope of her objection—requesting exclusion of Lombardo's testimony as he is unqualified to provide reliable

critiques of Dinakar's human factors findings. Plaintiff, however, makes no substantive arguments as to relevance of Lombardo's testimony under Rule 702(a). (Doc. 78 at 3–8).

Indeed, the Court need not engage in a qualifications assessment, as Lombardo is not proffering this testimony as a human factors expert. (*Id.* at 3; *Id.*, Ex. 1 at 15, 91, 93, 98). Defendants are not offering Lombardo's critiques as human factors testimony but as a means to rebut human factors testimony. Lombardo need not engage in human factors analysis to engage in such rebuttal. "Unlike an ordinary witness, [ ], an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592 (*citing* Fed. R. Evid. 702, 703). And, presumably, "this relaxation of the usual requirement of firsthand knowledge [ ] is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Id.*

Accordingly, the Court evaluates whether Lombardo's testimony is reliable under Rule 702(b), (c), and (d) for the narrow purpose of rebutting Dinakar's findings. *See Gayton*, 593 F.3d at 617 ("The question . . . is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question."). The Court takes each of Lombardo's critiques in turn.

a. **Reasonable Response Time**

Lombardo critiques Dinakar's "reasonable response" findings that Barnes engaged in a steering maenuver before the collision. Lombardo says Mr. Dinakar's finding that Mr. Barnes' response was "within the range of typical responses of attentive drivers" is not consistent with the evidence. (Doc. 78, Ex. 2 at 39). The Court

finds Lombardo's conclusions were the result of a methodology grounded in reliable principles of accident reconstruction and mathematics.

Following his collection of the pre-collision data from the Sensing and Diagnositics Moduel, Lombardo imported his 3D scans from his scene and vehicle inspections into *Autodesk 3DS Max*, a peer-reviewed process for accident reconstruction by which video analysis is matched with reference points in 3D scans. Lombardo further imported camera-matched positions and scene data into *PC Crash*, a physics-based simulation software that is peer reviewed and generally accepted in the accident reconstruction, physics, and mathematics. Next, Lombardo used *Axon Investigate*, a video analysis software, which employs a frame-by-frame analysis of the dash camera footage taken from Hegger's tractor-trailer. Along with the photographs depicting tire marks, scrapes, and gouges, Lombardo uses this software in support of his theory that Hegger's trailer had been fully established in the travel lane at the time of the collision. Lombardo's testing by way of these several methods yields little to no evidence of a manuever on the part of Barnes, leading to his theory that Barnes was inattentive pre-impact.

Lombardo analyzed Johnson's reports and testimony. He determined Johnson's mathematical calculation of Hegger's travel speed was inaccurate given the acceleration values and distance quoted by Johnson. He also compared Johnson's testimony on the acceleration rate of Hegger's vehicle with Johnson's report—suggesting Johnson's report describes an acceleration nearly three times the published average acceleration of Hegger's model of tractor-trailer. Lombardo suggests his tests render Johnson's findings and calculations mathematical impossible. (Doc. 78, Ex. 1 at 108).

Lombardo also evaluated the testimony of Dinakar. (*Id.*, Ex. 2 at 39–40). Dinakar uses Johnson's findings to support his own opinions. Specifically, Dinakar relies on the Johnson's conclusion regarding leftward off-set assists in his own conclusion that Barnes made a maneuver approximately two to three feet to the left prior to impact. (*Id.* at 13). Lombardo suggests Johnson's findings are mathematically impossible and challenges Dinakar's reliance on Johnson's findings as equally unreliable. (Doc. 78, Ex. 1 at 108). Accordingly, Lombardo's disagreement with Johnson's conclusion regarding the claimed offset maneuver, which Dinakar uses in support of his own expert findings, is itself the basis of Lombardo's critique of Dinakar's approach. This is not improperly outside the scope of Lombardo's expertise, as his critique on this basis is grounded in opposition to another accident reconstructionist — Johnson.

Although the Court found Dinakar's testimony admissible and independently reliable absent Johnson's findings, Dinakar still makes use of Johnson's testimony to establish his own findings as to Barnes' purported steering maneuver pre-impact. Lombardo's critique is, therefore, fairly proffered as rebuttal testimony, as it is grounded in principles of accident reconstruction. Defendants have satisfied the reliability requirements of Rule 702. Plaintiff's objections to Lombardo's critiques on this basis are more aptly described as disagreements over the factual underpinnings. *Walker*, 208 F.3d at 586–87. This issue is better suited for the jury, as it is a question of credibility more than it is admissibility. Johnson, Dinakar, and Lombardo are all properly testifiying within their respective fields using reliable methodologies.

### b. Peer-Reviewed Studies

Plaintiff also seeks exclusion of Lombardo's opinions as they relate to the peer-reviewed studies published by Kusano and Gabler in 2011. Defendants contend this challenge misunderstands and overly extends the field of expertise necessary for Lombardo to rebut findings by Dinakar that rely on these studies.

Lombardo critiques Dinakar's use of the study because the research only evaluates drivers who applied brakes before the collision and, according to Lombardo, there are indications from his own accident reconstruction that Barnes' applied his brakes before the collision. (Doc. 78, Ex. 2 at 37). As Lombardo notes, "the study specifically stated that the average time to contact of 1.1 to 1.4 seconds was for drivers who braked prior to a collision. The CDR data recovered from Barnes' vehicle and the lack of pre-impact tire marks on the roadway indicated" Barnes did not brake prior to impact. (*Id.*). Plaintiff contends Lombardo fails to account for the relevance of the study in assessing the perceptual limitations of drivers approaching slow-moving vehicles, but this is not a sufficient basis to exclude a finding grounded in physical evidence.

Here, Lombardo's conclusions are based on his analyses of electronic data from Barnes' CMV airbag control module, which reflected no application of the vehicle's brakes. (*Id.* at 37–39). With this data in hand, Lombardo opines that Dinakar's reliance on the study is misguided because the study only assesses drivers who applied their brakes. (*Id.*). This is an important distinction from the perceptual limitations that Plaintiff relies upon. Plaintiff asserts the same contention for several pages in its request for the exclusion of this opinion and others proffered by Lombardo, arguing he must be

qualified in the field of human factors to make such critiques. Again, the Court is unpersuaded. Lombardo is not hiding the ball concerning the software he employed in his investigation, the facts and data analyzed, his approach, and methods of testing alternative theories of both Dinakar and Johnson. *See Turubchuk,* 958 F.3d at 555.

Plaintiff next seeks to exclude Lombardo's opinion that Barnes was "comparable to the worst 20 percent of drivers who were already slower responders than drivers who avoided a collision." (Doc. 78, Ex. 2 at 37). Lombardo suggests that, even if Barnes made the steering manuever, he was still slower than the average driver in the Kusano and Gabler study. He suggests the application of the study to this case by Dinakar is fundamentally flawed because it "only reviewed drivers who crashed and excluded any drivers who were able to avoid a collision." (*Id.*). Lombardo says Dinakar's use of this study is the equivalent of suggesting that—among those who failed a driving test— Barnes was an "average" driver among them. (*Id.*). This criticism is grounded in principles of accident reconstruction, site scanning, and mathematics—not perceptual or behavioral humans factors analysis. On this basis, Defendants have satisfied the requirements of Rule 702. *See* Fed. R. Evid. 702(b)–(d). Lombardo may offer this critique.

### c. Sensitivity Analysis

Finally, Plaintiff argues Lombardo's critiques of Dinakar's opinions as to the sensitivity are "areas firmly within the field of human factors." (Doc. 78 at 6). Again, the Court disagrees. Lombardo makes several findings on the basis of sensitivity that Plaintiff seeks to exclude, including that: (1) an "average, attentive driver (50 percent of drivers), as defined by Mr. Dinakar, would be able to avoid the collision with emergency braking";

(2) the "average, attentive driver (50 percent of drivers), as defined by Mr. Dinakar, would be able to avoid the collision with moderate steering and braking"; (3) an "[a]nalysis indicated drivers with a slower than average perception-response time (PRT) of 2.6 seconds (approximately 67 percent of drivers) could avoid the collision with aggressive braking of 0.6g and aggressive lateral steering of 0.25g"; and (4) Dinakar's "opinion that Mr. Barnes was faced with an unavoidable crash for the majority of drivers was unsubstantiated since the PRT values he supplied indicated at least 50 percent of drivers could have avoided the collision." (Doc. 78, Ex. 2 at 37–38).

In grounding his critiques, Lombardo begins with the premise that Dinakar is *correct* in application of 2.2 seconds of PRT. (Doc. 78, Ex. 2 at 37–39). Lombardo's criticism is based on of his analysis of the rate of acceleration by Hegger's tractor-trailer, along with his calculation of the distance that Barnes would travel at the speed reflected by the electronic data from Barnes' airbag control module—by Lombardo's math, at 73 mph, 236 feet in 2.2 seconds. Likewise, Lombardo notes that the data relied on by Dinakar—0.13g lateral acceleration and 0.4g deceleration—are only moderate braking and steering, not emergency maneuvers, which is well within his expertise as an accident reconstructionist. Lombardo input Dinakar's own values into the software used by Dinakar. This analysis is rooted in mathematics, not perpetual or behavioral human factors analysis. Therefore, as it relates to Dinakar's sensitivity analysis, Lombardo's testimony satisfies the reliability prong of the *Daubert* inquiry.

Even still, Lombardo may properly defer to expertise outside his own to inform his own investigation subject to appropriate limits. For areas outside of an expert's field,

district courts may properly conclude that an expert could, "indeed must," rely upon other experts "having such industry-specific experience." *Gopalratnam*, 877 F.3d at 789 (citations omitted). "An expert is not entitled to testify to opinions that rely on the opinion of another expert, simply because the other is an expert." *Id.* (internal quotation marks omitted). Although Lombardo's opinions criticize Dinakar, they are well within Lombardo's expertise—principles of accident reconstruction. Experts can base their opinions on disputed facts because the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact." *Stollings* 725 F.3d at 765. Plaintiff's objections to Lombardo's critiques sound more like challenges to the veracity of Lombardo's conclusions. Consistent with his other critiques, Lombardo's critiques of Dinakar's sensitivity and attentiveness analyses are properly admissible. As Defendants have satisfied Rule 702, Plaintiff's Motion to Exclude, (Doc. 77), is **DENIED**.

### 4. Dr. Christopher Spaeth

Plaintiff seeks to exclude the testimony of Dr. Spaeth, Defendants' expert in toxicology, regarding the physiological effects of drugs present in Barnes' system at the time of the accident. Plaintiff objects to Spaeth's findings as to "impairment and proximate causation" of Barnes, or whether the drugs in his system contributed to the collision. (Doc. 79 at 1). Plaintiff challenges Spaeth's conclusions, most notably that:

> Taken together, the drugs in Mr. Barnes' system more likely than not were causal to the accident that occurred on November 4, 2020. The combination of drugs, both prescribed and misused, in Mr. Barnes' system would more likely than not significantly contribute to sedation and psychomotor

deficits. All of the sedative drugs act as central nervous system depressants and would at least have an additive effect on sedation.

(Doc. 80, Ex. 1 at 4). Although Plaintiff challenges Spaeth's qualifications to opine upon proximate causation, the Court need not qualify him as a toxicologist to address this issue—nor is Spaeth being offered as an accident reconstructionist or human factors expert. Accordingly, the Court need only consider reliability and relevance.

Plaintiff claims Spaeth's use of generalized data regarding opioid impairment fails to address why tramadol is distinct from stronger opioids. (Doc. 80 at 2–3). Plaintiff also contends Spaeth makes unreliable use of the morphine equivalency dosing tool, "Morphine Milligram Equivalents" ("MME") to predict impairment from blood concentrations, alleging this method is scientifically inaccurate and unsupported by accepted toxicological methods. Plaintiff cites Spaeth's admission that he is unaware of scientific literature to endorse MME's use for dosing conversions. (Doc. 80, Ex. 2 at 101).

Spaeth supported his use of dose equivalencies to compare potency by citing the "Royal College of Anesthetists" document. (Doc. 90, Ex. 2 at 16, n. 58). "Germane to this assessment is Tramadol which is well-documented in the peer-reviewed toxicological literature as possessing moderate-to-substantial postmortem redistribution levels." (*Id.* at 17). He provides the following table in support this comparative approach:

**Table 4.**
**Comparative Potencies of Orally-Administered Opioids[58]**

|  | Name of Analgesic | Equivalent dose to 10mg oral morphine | Potency Compared to Morphine |  |
|---|---|---|---|---|
|  | Hydromorphone | 2 mg | **5x** | STRONGEST |
|  | Oxycodone | 6.6 mg | 1.5x |  |
| Baseline: | Morphine | 10 mg | **1.00** |  |
|  | Tapentadol | 25 mg | 0.4x |  |
|  | Codeine phosphate | 100 mg | 0.1x |  |
|  | Dihydrocodeine | 100 mg | 0.1x |  |
|  | Tramadol | **100 mg** | **0.1x** | WEAKEST |

(Doc. 90, Ex. 2 at 16). Defendants push back on Plaintiff's challenge to comparative potency analysis, contending the practice is widely accepted and understood in the scientific literature. (Doc. 90 at 6–7). Defendants also contend Spaeth's use of MME to provide a full accounting of opioid deficits is well-grounded in science. (*Id.*).

Next, Plaintiff argues Spaeth should not be allowed to comment on the "additive" effect of the various drugs in Barnes' system when he rear-ended Mr. Hegger's tractor-trailer. She contends Spaeth misapplied research in making several conclusions on this point. Defendants respond by citing research indicating the drugs at issue increase "GABA signaling" — explaining how the molecular mechanism of temazepam is the same as other benzodiazepines. (*Id.* at 7). Defendants also submit that scientific articles and the tramadol product monograph state that "tramadol binds opioid receptors and increases GABA signaling to produce analgesia" and that "diphenhydramine is a sedating antihistamine, by definition." (Doc. 90 at 8–9).

Although limited research on the combined effects of temazepam, diphenhydramine, and tramadol exists, "the molecular mechanism of action of each drug

is known. Putting together three known sedative drugs in an individual would be expected to increase sedation." (Doc. 90 at 8–9). Further, "the temazepam Barnes was prescribed presumably came with a package insert and labeling. The package insert and labeling for temazepam contain a black-box warning prohibiting the use temazepam and opioids in combination." (*Id.* at 8). As Defendants suggest, the existence of pharmacologically-relevant levels of three known sedatives would increase Barnes' overall sedation more than any one of the drugs on their own.

Plaintiff further contends Spaeth misapplied studies to conclude tramadol increases crash risk—suggesting reliance on "population-level opioid" data is misplaced. (Doc. 80 at 12–14). However, it appears from that research that "the risk of an accident for drivers using prescription opioids was independent of demographical characteristics, driving history, and alcohol use," and a "larger study including more drivers confirmed these results." (Doc. 80, Ex. 1 at 7).

Plaintiff concludes by suggesting Spaeth is improperly opining on the proximate cause of the accident, suggesting he lacks the qualifications of a human factors or accident reconstructionist to make such findings in a reliable manner. Defendants contend Plaintiff misapprehends the purpose of Spaeth's testimony as it is proffered in the context of toxicology, arguing she overstates any suggestion in the testimony as to causation.

Working backwards from Plaintiff's findings, the Court first disagrees with Plaintiff's suggestion that Spaeth opines improperly on proximate causation, or that such opinion is outside the scope of his expertise. Spaeth is proffered as an expert toxicologist to provide analysis and testimony regarding the blood profile of Barnes. He may not, and

does not opine on concepts like alertness, eyesight, and decision making. At most, Spaeth opines that, due to the combination of drugs in Barnes' system, he likely experienced some impairment that *contributed* to cause the accident. This is not an impermissible finding of causation. Whether drowsiness may have contributed to the collision merely reflects Spaeth's interpretation of the toxicology profile. Although the jury may find his testimony instructive in its determination of proximate caustion, the testimony is not offered for such purpose.

As for the precise scientific critiques offered by Plaintiff in her attacks of the reliability of Spaeth's findings, the Court recognizes significant disagreements on core scientific principles of research and analysis. All the same, without an affirmative showing or refutation by Plaintiff, the request for exclusion on these grounds are misplaced—including Spaeth's utilization of: comparative dosing equivalencies; MMEs; additive effect analysis; and population-level opioid data. In each of these challenges, Plaintiff offers no argument that affirmatively refutes the principles and methods of Spaeth, or his application of them to the facts and data. Defendants have also adequately countered each of Plaintiff's concerns, suggesting there remains differences of opinion as to the credibility of Spaeth's approach or scientific method.

The Court will not delve deeply into scientific controversy between the parties. The inquiry is limited to whether Defendants have satisfied the requirements of Rule 702. Here, Defendants have cleared this hurdle—showing Spaeth's testimony complies with Rule 702(b), (c), and (d). Spaeth's testimony is also relevant, as it explains scientific concepts of comparative dosing equivalencies, MMEs, additive effect, and the impact of

population opiod data in relation to the subject collision. Disputes on the science are more properly deferred to the trier of fact. These are issues of credibility and weight, not admissibility. *See Manpower*, 732 F.3d at 808. As with the other experts, Plaintiff may challenge or impeach Spaeth with cross-examination and contrary evidence. *Artis*, 95 F.4th at 527. For these reasons, Plaintiff's Motion to Exclude, (Doc. 79), is **DENIED**.

## IV.    CONCLUSION

The Court makes the following findings on the outstanding motions:

1.  Defendants' Motion to Exclude Kevin Johnson's Expert Opinion Testimony, (Doc. 67), is hereby **DENIED**.

2.  Defendants' Motion to Exclude Swaroop Dinakar's Expert Opinion Testimony, (Doc. 69), is hereby **DENIED**.

3.  Defendants' Motion to Exclude Dr. William Sawyer's Expert Opinion Testimony (Doc. 71) is hereby **GRANTED IN PART** and **DENIED IN PART.** The Motion is **GRANTED** as to the Rule 26(a)(2)(B) disclosure violations. Opinions offered by Dr. Sawyer grounded in concepts of "looming" and "reasonable response times" are excluded insofar as they were not proffered in his timely Rule 26(a)(2) disclosure. The Motion is **DENIED** with respect to challenges grounded in Rule 702 admissibility.

4.  Defendants' Motion to Exclude Adam Grill's Expert Opinion Testimony, (Doc. 81), is hereby **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** with respect to Adam Grill's Conclusions 3, 4, 5, and 6 (as applied to GML). The Motion is **DENIED** with respect to Grill's

Conclusions 1, 2, and 6 (as applied to Hegger). The following findings and related testimony shall be excluded:

- Defendant Hegger's action of parking on the shoulder of an Interstate Highway was grossly negligent and reckless.

- GML is responsible for the actions of Defendant Hegger as it relates to the safe operation of a CMV.

- GML is responsible to train and supervise their professional drivers; namely Defendant Hegger.

- According to industry standards, this collision was preventable on the part of the Defendatn Hegger's motor carrier, GML.

5. Plaintiff's Motion to Exclude Testimony of Defendants' Expert David Griffin, (Doc. 73), is **GRANTED IN PART** and **DENIED IN PART**. The Motion is **GRANTED** with respect to Griffin's Opinions 2 and 3. The Motion is **DENIED** as to Griffin's Opinion 6. The following findings and related testimony shall be excluded:

- GML has demonstrated safety management controls that meet the prescribed FMCSA Safety Fitness Standard outlined in 49 CFR Part 385.

- FMCSA safety statistics published on their public websites indicate that GML has historically operated in an extremely safe and compliant manner.

6. Plaintiff's Motion to Exclude Testimony of Defendants' Expert Sergeant Bradley T. Brachear, (Doc. 75), is **DENIED** under Rule 26(a)(2)(C) and Rule 702.

7. Plaintiff's Motion to Exclude Testimony of Defendants' Expert Nathan Lombardo, (Doc. 77), is **DENIED**.

8.  Plaintiff's Motion to Exclude Testimony of Defendants' Expert Dr. Christopher

Spaeth, (Doc. 79), is **DENIED**.

Entered: 9/25/2025

COLLEEN R. LAWLESS
UNITED STATES DISTRICT **JUDGE**